The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. The health and safety of student-athletes is of paramount importance to the NCAA and the U.S. Government, and they have reasonably determined that the best way to effectuate that goal is the adoption of this essential eligibility requirement at stake in this case. That is the policy that requires that in order for an injured player to return to play, the team physician must exercise independent medical judgment and determine that it is safe for the player to do so. In this case, Mr. Class sought and received from the District Court an exemption from that essential eligibility requirement. Is there a tension between that policy and the ADA requirements? No, Your Honor, and the reason is that the cases have recognized that it's highly relevant consideration the safety of the individual who seeks the accommodation, that where there's a threat to life, to self or others, that that is disqualifying and that the individual is not otherwise eligible because to participate would place the individual at risk of death or serious bodily harm. Have you taken a position whether Mr. Class poses a risk to anyone else's safety? No, Your Honor, it's safety to himself that's at issue in this case. And in this case, the team physician exercised independent medical judgment and considered relevant and competent medical information in determining that playing contact collegiate football would place Mr. Class's life at risk. In your view, is that the end of it? If you could have a thousand other people to say it, it didn't matter, you could say he's fine, but if the team physician does it, does that end the inquiry? Well, what the courts have done in assessing... And they support it by a rational basis for the team physician having done so, but you still have a number of, let's say, a thousand people who say different, then does that end the determination? Well, the... I ask that because you're going to tell me what the court said, and I want to use that as a basis. I'm not trying to trick you. No, I understand. I'm just asking what is your position to the extent, what do you think, how should we look at the team physician's testimony? If it is some... If there's no reason for us not to believe or it's substantiated by something there, and yet you've got, in this instance, a couple, but if it was 10,000, let's say, or five, the number shouldn't matter of others who say totally the difference who are experts in it. How are we to view the team physician's testimony or statement, decision? The cases adopt a highly differential standard of review, Your Honor, and what... What cases? Involving... You mean the Seventh Circuit? No, Your Honor. I'm talking in a more general sense about the standard of review for decisions made by colleges and universities with respect to whether a requirement is an essential eligibility requirement and whether an accommodation is reasonable. Like, for example, Halpern, this Court's decision in Halpern, and the decision in Davis versus University of North Carolina, and the decision in Doe versus University of Maryland Medical Systems.  In fact, Davis cited Knapp with approval in adopting and implementing a differential standard of review. And what all of the cases, and I think it's telling that in every one of these cases, the district court had determined in favor of the university and had adopted that, unlike the district court here, had adopted that differential standard of review, and what the courts look at is, is it a reasoned decision based on competent evidence, not could another team physician have reached a different conclusion, or even should the team physician have reached a different conclusion? The standard of review is really, could no reasonable team physician have reached this decision? Is it not based on competent medical evidence? Was it not individualized? Essentially, if it is individualized, it amounts to a veto power, doesn't it? If the team physician just has a veto over who plays and who doesn't, as long as they consider that person's medical history and all the other factors, for example, that Knapp talks about or other cases talk about. So it's pretty strict. I mean, you're pretty much saying that no expert could overcome that if it's the reasoned judgment of the team physician, isn't that correct? Yes, Your Honor, because it's not the battle of the experts. I mean, the team physician isn't charged with proving that it's unsafe. The team physician is charged with, is certifying really that it is safe, is making a determination that it is safe. Well, what if there had been an independent medical exam by a medical doctor in this case? Could that have made a difference in the analysis from your perspective? No, Your Honor, because the- But then it is a veto power. If it's individualized and reasoned, it's a veto power. Yes, Your Honor. That is the- A team of doctors, a team of MDs specializing in heat stroke, couldn't not overcome the university physician in your point of view. Is that correct? Yes, Your Honor, especially because her decision was not just based on the heat stroke. It was based on- Well, no, the whole person. The whole person. She was very careful to say, I'm talking about the whole person. I understand that. Yes, Your Honor. But you're saying that if there is a cadre of medical doctors from all over the country who examined this person, and they say the whole person is not likely to be harmed, that their opinion could not trump the team physician's ever? Isn't that essentially your position? Or if not, tell me why not. No, Your Honor, because it would really depend on whether the circumstances caused the court to be convinced that no reasonable doctor could have- Well, it goes to the question of reasonableness. Yes, it does, Your Honor. In other words, if we have that cadre of doctors, respected doctors who reached that conclusion, then you have to ask the question, what caused the physician, team physician, to reach its conclusion, his or her? And it seems to me the deference that the Seventh Circuit applied had that big escape hatch, escape hatch, which it had to be supported by evidence, had to be reasonable and- Yes, Your Honor. But you said- But it allowed for- The Seventh Circuit, you said it's in Halpern and Davis here, too. That's why I asked you is, where do you get that deference from, is that the Seventh Circuit? I clearly see it there. I don't see it in Halpern and Davis because those are academic-type cases. That's not dealing with the same subject matter that we're dealing with here. So in order to get there, we're going to have to agree with the Seventh Circuit. That's not the law in this circuit as in, from a presidential perspective. Yes, Your Honor. But I mean, it's even more critical where you're dealing with someone's life. I mean, if you look at Doe, for example- What was the case that we had involving the psychological fitness of a doctor? That was Halpern, Your Honor. That's Halpern. Yes, Your Honor. Now, there, that was a judgment call made by the university. Yes, it was, Your Honor. And what was our standard of addressing that one? It was the same highly deferential standard of review, Your Honor. And if you look at Doe- But again, it was an academic-type setting in which you were dealing with a disability determination claim. Well, yes, Your Honor. But it's even more serious- It's not what we're dealing with now. No, Your Honor. But you were dealing with fitness to be a doctor there, and here, you're dealing with a different question. But in- Totally different than playing football. Yes, Your Honor. The question here is even more serious because the life is at risk. So I would urge the court to examine- I accept that as more serious than playing football and being a doctor or the judgments a doctor can make. But you can proceed. What's more important, doctors or football? Oh, no. I don't think so. Sometimes. Well, I think either- both speak to safety, Your Honor. And that's- The fact of the matter is that that one seems like it might be a reasonable one. I'm not saying you shouldn't go in that direction. I'm just saying I don't think we should argue it as though we are stuck, that that's the way- that that is absolutely binding on the circuit, that determination. Well, I wasn't making that argument, Your Honor. I was actually arguing that it was- That's all I want to make clear. Yes, Your Honor. That it's very consistent. But I'd urge the court to look at Doe versus University of Maryland Medical System, which involved a safety and risk to life issue. The risk was very low. It was the risk of transmitting HIV, a surgeon transmitting it to a patient. It was less than 1% risk, as I recall. And yet, if it were transmitted, death could result. And so, because the actual- the magnitude of harm was so high, this court adopted a highly deferential standard of review, said that the doctors that made that decision were entitled to err on the side of patient safety and be cautious. In that regard, the NFL has a protocol now for handling concussions, and they yield to the medical person assigned to make that judgment call. And I notice even coaches and players want to get back on the field, but despite the fact that they feel quite good and they feel comfortable and they want to continue playing, the policy is governed by the opinion of the physician. And I assume that if there were a challenge to that, and we could hear it quick enough, the question is, how do we get involved in these discretionary judgments where the school is providing a sport and wants to provide it safely and sets its own rules for determining that safety in advance, unless, as Judge Wynn suggests, unless those rules were discriminatory in and of themselves. Yes, Your Honor, and this rule- I'm not sure I'm saying that, that I'm saying a rule, they can't set their own rules. The problem is, is that if you have a physician's statement, and here the allegation is the physician has made this statement, but when you go and look at the underlying basis for it, there's no literature that supports what she's saying. She's not a liver specialist. She's not a heat stroke specialist. And so when you look at what she's doing, and surely we want to give a deference, but even deference must have a proper foundation other than it certainly looks bad, because I think any layperson could do the same thing. When I look at this case, I'd say the same thing that physician said, because I don't know anything. It just sounds like to me it's not a good idea. But to get the opinion, you've got to have something that supports it. And all she's done is just given a statement, which makes sense to me because she's the team physician. But just that alone doesn't do it. And an NFL concussion situation is different, because in that instance, you don't have experts with concussions coming in saying, mate, let them play. If you had the foremost expert on concussions in the world come and say, he can play, and the team physician says, no, yeah, you would probably have a problem. Well, Your Honor, my first response to that is that the record does not support a team physician's assertion that this was just based on feelings or a gut reaction on the part of the team physician. And that, well, first of all, the literature that she cited, and which is cited in the Apple East brief at page 53, does support much of what she said. For example, it supports that 15% to 20% of heat stroke victims have decreased heat tolerance, and it can last up to five years. That's in the brief. Let me hear that again. 15% to 20% has what? Have decreased and impaired heat tolerance following a heat stroke, and that that impaired tolerance can last up to five years. And that heat illness, you know, which is a precursor to heat stroke, she testified that that could be catastrophic for him, given his constellation of complex problems. It's a generalized statement, whereas you have this heat stroke expert that says this individual, that when you put this equipment on him and put him in this position, is actually in a better position than the other folks out there on the field. Because he's actually being monitored, and the accommodations that this trainer you've got or this sports director says, it's not going to be that difficult a thing to do it, to have them monitor him, because we don't have to increase the staff a whole bit. I'm only just going to the act itself, and I'm not trying to be argumentative on it, but she doesn't go to that level. She doesn't. She just cite literature, which is okay to cite the literature, but there's nothing that ties it to this, whereas you do have someone that ties him to this. Well, you know, I have two answers to that, and the first of all is that Dr. Kassa evaluated just a very small part of Mr. Klass's complex medical issue, and he's not a medical doctor. That's the first, you know, problem with just relying on him. But he's clearly an expert on heat stroke. He is an expert on heat stroke. He's done it for the NFL. He's done it for all kinds of folks that you really cannot challenge his qualifications on heat stroke. He is qualified, Your Honor, and he says, because he's a co-author of that article I just cited, that there's a 15 per 20 percent risk of another heat stroke, and that there's decreased heat tolerance, and that there's a risk here. His own articles say that. So she, you know... Anyone who's ever had a heat stroke, that would in and of itself would be a basis to deny them if a physician says, I'm not letting you on because you've had a heat stroke once. Is that good? If they, under the deferential standard of review, Your Honor, that applies in this case, considering all of the things you looked at... Applies in NAP, and if we adopt NAP, it would apply in this case. With that caveat, Your Honor, I mean, you know, it might be, even in this case, I don't think, even if you apply a de novo standard of review, considering the evidence in this case, that there's been no general medical clearance by any doctor of Mr. Klass. There's a heat stroke expert, and that there's a liver doctor. But the problem with, you know, him... The doctor? Pardon me? The liver doctor, his doctor? I'm sorry. Isn't it the defendant's doctor? I mean... Yes, Your Honor, but he didn't speak... He said no, that has cleared him? He did not clear him generally. He cleared him as opposed, with respect to his liver. But he has more... I thought he said he could play football. He says he's not at an increased risk of playing football. He said that his liver... His liver is just as good as anybody else's, which I was amazed. We have a liver transplant expert to say his liver is just as good as anybody's out there. Yes, Your Honor, but that's not my point. My point is that, you know, all of his internal organs in that area are at risk because he has a hole in his abdominal wall. And Dr. Hudson, he's qualified to talk about the liver and the risk to the liver from playing football, but he's not qualified to opine on, you know, how football, you know, a hit in football would affect his internal organs. And Dr. Kinch, he was... I think his disqualification was based on the fact that he's exposed, increasingly exposed to heat stroke and that the study, which suggested that he could tolerate it, didn't fully simulate football and needed an accommodation. Yes, Your Honor. That was one of the reasons, but she gave other reasons as well. The June testing, I think the primary problem from her point of view with the June 2015 testing was it didn't mimic football. It didn't clear him to play, you know, for full play for football practice and play. It, you know, it cleared him to resume in July with, you know, a T-shirt and shorts and, you know, conditions that didn't mimic football. But, you know, she had to look at the whole picture and assess whether he could rejoin the team and, you know, with all that entails, the full gear with the extra padding. Okay. I see our red light's on, so you have to rebuttal. Oh, I'm sorry, Your Honor. Yeah, that's... You don't get a ticket this time. All right, Mr. Klepper. Thank you, Your Honor. May it please the Court. At the outset, before I start getting interrupted by questions, I'd like to make three points about an overview of where I hope to go in my short time. The first one is that Dr. Kinchey's testimony was the sort of testimony that if it had been a jury trial, this Court would have easily said it could have been kept from the jury under Dauber. And certainly, the trial judge's finder of fact was able to find that Dr. Kinchey's evidence was not... Her opinion was not based in competent medical evidence. The second point I hope to get to is this conversation would have an entirely different tone, I feel, if Gavin Klass were... If there were evidence that he were an on-the-bubble NFL prospect, where this were keeping him away from his vocation, even though legally, there's no difference. It's still injury. I don't get that one. All right. The first one, I got your point, but I don't get that one. The... Go to the third one. Well, just as Dr. Kinchey talked to unnamed people, I've talked to unnamed lawyers, and a theme that has come up has been, was this keeping him from being drafted? The relevance of it, though. Well... The determination here. Why don't you go on to number three? Okay. Yeah. Number three is, this decision can be affirmed on very narrow grounds that do not implicate any of the public policies that Towson and Amici are raising, largely appellate procedure. So on the first point, if Dr. Kinchey... What was that last phrase you just said? Why can it be affirmed now? It can be affirmed on largely appellate procedural grounds, narrow... I don't know what my last word was. Technical rules. Technical rules. Is that the... I didn't mean to say technical rules. But... What do you mean by that? Well, what I mean by this is, is that Dr. Kinchey, for instance, she... There was no proffer as to what she would have said about whom she talked to. There was no challenge properly to the record of physical... You've got a doctor here who is part of that sports medicine, which has an international reputation. It's hired independently by the university. She consulted her colleagues, as experts do, and she had had experience with heat stroke cases before. Taking pop shots at that doctor, I think, is not a fair thing to do. Well, Your Honor, that is absolutely what I'm here to do. Not hot shots. It's not a winning strategy, I don't think. Judge Keenan, if I may please address that point. Because... Well, before you do, though, think about this. It's the court's duty to qualify an expert witness. There is no... Well, it's the proponent of the expert's duty to qualify, but the court to pass on the qualification. And this person is a medical doctor, five years' experience in sports medicine, a demonstrated background in the subject matter. I just... To me, it's a non-starter to make the argument that she shouldn't have been allowed to testify. She's a medical doctor. She's entitled to give her opinion. Your Honor, what I mean to say... You're just saying that it's entitled to less weight for some reason. Yes. What I'm trying to say is that the inference from this is that Judge Bennett was perfectly within his rights to find that her testimony, as was presented, not her qualifications, her testimony lacked competent medical basis. And here, let me tell you why. She made... You're saying then that a doctor giving her considered medical judgment has to have other people agree with her in order to have a competent base level for her opinion? Your Honor, let me explain here for a moment. The bigger problem is the doctor is hired by the university to serve a function for qualifications. Yes. And if the university acted unreasonably or had a discriminatory intent in doing that, that's one problem. But if the university in good faith has a policy that says we want to qualify our sports by having an independent doctor tell us, who we predetermined in advance, they didn't pick her for this case, who tells us in advance whether this person can play that sport and we're going to rely on that, then it seems to me that if the courts aren't going to be getting involved in university decisions, intermural university decisions, we have to basically assess something to the effect that was the doctor at all have any support for it or was she had discriminatory animus or something like that. But in this case, the doctor recognizes life and death at issue, recognized that there's an increased level of heat stroke for a person who's experienced it, knew that this guy almost died, was in a coma for nine days. He's now coming back heroically, coming back wanting to play, and they haven't simulated even a real football game. I'm just trying to figure out, I played football, and I'm trying to figure out how you would monitor this guard's temperature in a march down the field where there are no timeouts. Your Honor, it takes 45 to 60 minutes for the temperature to rise to heat stroke. You don't go from 99 to 100. Here you are in the third quarter, and you're pressing on a quickened offense, and you're going down the field, and it's hot, and everybody's dripping wet, and they're all puffing and huffing, and they don't want to give them breaks. And this man, every five minutes, has to be monitored. I don't know how it works. I was going to get to that later with you, but I might as well- Dr. Kinsey doesn't know how it works either. She doesn't. Well, Your Honor, if I may, if I may for a moment. It doesn't matter whether it works. The question is whether the university has to be put up to that. This is not a discriminatory policy. May I please make- I would like to just get out my points for why I do not believe Dr. Kinsey's- It would be better if you tried to address our problems. You need to answer our questions. Okay. I am answering your question. You're kind of giving the impression that the questions are an annoyance. I'm sorry, Your Honor. Yeah. Well, Your Honor, I've had two judges tell me this, and I'm sorry if I'm getting a little agitated right now. I'm sorry. This is my own problem. I'm very excitable. Let me give you, at least, first of all, let me say, I think your points are well taken if you make them in a proper way, but attacking that doctor directly is not going to get you anywhere in here. And secondly, the points where Judge Nima has gone deals with the operation, and you probably have a better stand to say that's really not an issue they brought up in terms of disruption of the team. It really kind of moves me, too. I understand that. I played this game, too, and it kind of bothers me on the disruption. I'm not sure that's the issue. If you deal with the disability aspect of the ADA, deal with whether it's a disability, and then are there accommodations, and do you have the support to say accommodations can be made, which it looks like the record supports it, then you've got the team position. And the question then comes up is should we give that deference in light of this expert testimony over here? Your Honor, I... It seems to be an easier way to go than the way you're going. Well, thank you, Judge Winn. Let me tell you, ADA, what it requires is an interactive process. And what we know that Dr. Kinshi did not do was she did not pick up the phone and talk to KSI at any time. She never did that. And what happened here was that Dr. Kasa is not our expert. Dr. Kasa is Towson's expert because Dr. Kinshi does not claim any expertise in heat stroke, and she is a sports medicine specialist. So what happens... A sports medicine specialist works with populations. They aren't necessarily experts in every condition that affects that population. So what did they do? What did Towson do? They retained... You know, what you're doing is the very same thing that we've cautioned you about.  And the question is, this doctor is an established, reputable doctor who has been handling this along with her colleagues in this pretty well-known sports medicine clinic. And Towson didn't go hire its own doctor in-house. They went outside for an independent person. And so the question, I think, is the very first question Judge Winn raised is they have this qualification. You have to be cleared by the doctor, the team physician. The NCAA has suggested don't rely on outside physicians, stick with your team physician to regulate it. Now the question is, what's wrong with that? Okay, Your Honor. That policy. That policy. I do not have a problem with that policy, Your Honor. The problem is, is when the policy here... When the doctor turns into a veto... Let me ask you this next question. Yeah. If you don't have trouble with the policy, what is the problem with the carrying out the policy? Because Towson didn't dictate how to make this come out. Towson basically asked its team doctor that it hired, does this guy clear? And the doctor says no. So Towson says we follow that. What's wrong with that? What is wrong with that here is that this system... What happened here was that, and I'm not accusing Dr. Kinshi of bad faith. I'm not doing that. What I'm doing here is I'm trying to explain why this June 2015 report, this addressed the issues. She didn't have the June 2015 report in front of her, which had these recommendations. And it said he passed with flying colors. Now it didn't simulate football. That's not how these tests are run. And what was established was she never called KSI and said, could you run this with the football gear on? Now he performed better than most anyone would do, any athlete would do. And this is a protocol that the NCAA already uses. So you're right about that. Yes. Why does that justify saying the doctor can't have her opinion? In other words, there are reasons to attack that study because I personally don't think those conditions that were simulated in the study were what I experienced as football conditions and not for the duration, not for the humidity, not for the intensity of all that's going on, the pads, the helmets and all this. But set that aside. Let's assume that could be satisfied. That's an opinion that disagrees with the doctor's opinion. You want us to get into the battle of the experts and solve a problem as to whether the policy was followed. It was followed. Now, it was followed imperfectly, but it was followed perfectly. So now the only question is what's wrong with the policy. And you have to argue that the policy is irrational because it relies on a doctor without us having to second guess the doctor. If there is a problem with the policy is that it doesn't allow a safety valve. It doesn't allow any... For whom? For anybody challenging the team physicians. The policy is a university policy and the university policy is to make its sports safe. Next week, they don't want a dead man on the field because some doctor, outside doctor or the doctor of the player said he can play. Your Honor, in all circumstances, this is a veto. It's final. And there is nothing, there's no room for the ADA interactive process here. Well, didn't KSI though essentially agree that this had to be done at the discretion of the medical professional? I mean, that's exactly what their recommendation said. That all exercise shall take place at the discretion and direct observation of a medical professional. Yes. And with... So to follow out that recommendation then, you're saying they have to find a physician who agrees with you that he is qualified to play. They can't select the medical professional who's going to make judgment calls regarding the ability of players to play. They have to find someone who agrees with you because she can't exercise discretion to monitor this person after ethically, after she said that he can't play. It's too dangerous. She can't do it. So it seems to me that it's a little bit of a tricky situation here because the university would be required to find a doctor who agrees with you, would it not? No, Your Honor. In order for that doctor to supervise. Well, how do you select the doctor? Supervisor? There's no claim that Dr. Kinshi would refuse to monitor. No, no, no. Answer, answer... Oh, I'm sorry. I misunderstood. Answer the question. The question is, how do you administer a program which gives another doctor discretion against the university's doctor? In other words, during the course of the game, it's under the supervision and discretion of a doctor. How do you select the doctor and what powers do you give to the doctor? And when do you give the team physician discretion or that doctor discretion? How's that work? No, I'm not asking for another doctor to be on the field, Your Honor. So you're asking that Dr. Kinshi be required against her ethical judgment to have this person play and to decide when it's too dangerous, when she's already said it's too dangerous even for him to go out there? Let me give you a hypothetical. How can you ethically put the doctor in that situation? That's one of my questions. She has the ethical obligation to care for any player that's within her care. I mean, let's say Towson had a different system where there were some outside panel and there were a team doctor who didn't feel comfortable, but it was somebody else's determination to play. The team doctor would still care for the player. Now one thing that might happen- I'll just go to the report, the quote from the report. You would have the team physician that Towson has in place be at every game, right? And monitor his performance at the game and make judgment calls about whether he should play or not. I don't think that's how that's proposed to work, Your Honor. If you get on a piece of exercise equipment, it says to consult a doctor before you do it. Right, right. But the KSI recommendation is quite specific. It says at the discretion and direct observation of a medical professional. So how are they going to do it except being there? All right, well, I think Dr. Kinchey is at the games. I mean, she is the team physician. And let me give you a hypothetical. If there had been an actual interactive process here, Your Honor- So you're willing to let her exercise that judgment at the game? At the- I will give- yes. And let's- let me give you an example. For the game today, the temperature is 92 degrees, 69 percent humidity. She says that's just too hot. I'm not going to allow him to play. What happens then? There probably wouldn't be a lawsuit over that, Your Honor. If there's no lawsuit over that, then why is there a lawsuit over this? Because what is happening here is that she has said under no circumstances would she have cleared him to play. Let me give you an example. So KSI says you should normally start monitoring very heavily when somebody gets to 103 degrees with a core temp monitoring system. The doctor might be able to say- if she wants to say, you know, I'm more comfortable if you set that- that he's absolutely taken out of the game at 103 degrees, which is still eight degrees away from heat stroke. So he's a starting right guard, and you're going to pull him out of the game to let him cool down for, what, 20 minutes? Well, just like a concussed player gets pulled out during the game- He gets pulled out permanently. Well, it depends on the protocol, Your Honor. What I'm saying- The protocol says he can't play. All right. Well, let's say that this is something where somebody has suffered an ankle injury. Do you take them up and put them back on? What- Who designs the protocol in terms of when to remove him? Does Dr. Kinchey design it? Have you thought this through? I mean, it's pretty sticky. Your Honor, let me- Well, answer the question. Who's going to design the protocol under this injunction of the district court? I think that Dr. Kinchey and the team trainer are going to design it. I mean, if she doesn't feel he should be cleared- Well, how can you take all these attacks on her, calling her basically incompetent, and then argue that she should be the one exercising the discretion out of game? She already exercised discretion in the broader picture to reach qualifications, and she concluded he should not compete. The risk is too great. We're talking about life. Yes. And now there's a court order that says you have to let him play, but it's under your supervision, Doctor. What is she supposed to say? I think she is supposed to be the team physician then. I think she is supposed to care for a player as she would normally and monitor for danger signs. Let's remember, the university, the head of sports medicine for the team, went out there and he said this would not present a problem for us. We monitor players all the time. This would not impose any additional strain on our staff. Monitoring requires that every five, ten minutes, right, to get close to the player with a monitor? Yes. Which can be done in the huddle, Your Honor. Who's going to go out to the huddle? The training staff. It happens all the time. Not without a timeout. Is there any evidence in this record about- How are you going to have him go out to the huddle during the course of a game? A football game. Your Honor, players come back and forth in and off the field during huddles. So you have trainers coming back and forth against all the rules of the game? Your Honor, you have, what, 24 seconds on the game clock to run another play? That is time. There are players exchanging, running back and forth during that time. So they can't run in plays without a huddle, I guess, under that circumstance? Your Honor, huddles do not last 45 to 60 minutes. A lot of plays don't have huddles. Yes. Your Honor, I see that. And I realize I am not convincing you. And that's fine. I'm doing my best up here. I don't know whether you're dealing with the operation or disruption of the game itself. But I do have a question regarding the team positions. Yes. I think it interests me. Is it something special about a university's position for which that position gets deference when giving an opinion regarding the ADA or an individual who otherwise would qualify? Let's assume, otherwise, without this team positions, then ADA, under the American Disabilities Act, this person would be allowed to play. Is there another setting outside of a university? Because and keep in mind, as the counsel on the other side said, this position operates for the university in an academic setting, too. So it's not just sports. You're going to be a doctor or you're going to be on the staff or whatever. It's the university physician that's given a special authority. Is there another setting that fits this? And I'm thinking, what if a person had a diabetic condition dealing with the eyes and working with machines? And the ADA says, oh, you can make accommodation to deal with it. But this company doctor says, oh, no, can't do it. Do we give deference there? No, Your Honor. Is there any other setting? I'm just trying to think, what is this uniqueness with the university that this doctor gets this power over the ADA when otherwise the ADA would allow you to be accommodations are there. Everything can be done. But you get a veto as the doctor of the university. There is no other situation. And why I think where the ADA comes in, I need to keep coming back to the interactive process. And let me tell you what more I believe Dr. Kinchey could have done. I do not mean to attack her as a doctor. I really don't. What I mean to do here, Your Honors, is to say that the opinion, the particular opinion she gave on the facts of this case, she did not find, Your Honor, you cited research. You said support her position. She didn't cite that at trial. She said she had no research to support her position. It's only after the fact they've come up with more research to support her position. They could have done a better job presenting this case. She contradicted herself. I would really like the court to look at Joint Appendix 23 to 24. What's the conclusion you want us to reach? The conclusion I want you to reach. With respect to looking at that. I would like you to reach the conclusion that when Gavin was initially disqualified. No, no. I want, with respect to Dr. Kinchey. With respect to Dr. Kinchey, that she is contradicting herself. All right. What would that lead to? What's the next conclusion we draw? The conclusion I draw from that is that as that says, they have no whole person concerns. Their concerns is his risk of recurrence of heat stroke. The cascade of symptoms that are discussed there are if, and only if, heat stroke occurs. Rules of the game? I mean, this is a university that offers sports. And it defines the sports. It can limit the weight to 150 pounds. Football, as Princeton did, or I don't know if they still do. It can impose various types of restrictions. You can probably have to run so fast you can't, a guy with a limp may not qualify. They have qualifications. They have academic qualifications. They can be arbitrary. We want everybody to have a 3.5. That's unreasonable. That discriminates against people who are not as smart. And the answer is, is this something we get involved with? In the internal affairs of the program being offered by a university. And the question, legitimate question is, well sure, we're going to get involved if there's evidence of untoward conduct. In other words, if it's not reasonable, not free, but this is pre-established. This wasn't focused on Mr. Class. It was focused on an overall judgment they made about how to organize the rules for the university, and they decide that we don't want the risk. He was close to death last time, and he's more susceptible. Everybody agrees on that. He's more susceptible to heat stroke. The accommodating factors don't limit heat stroke. All it does is give you a warning, maybe, to pull him out of the game. But it doesn't minimize the heat stroke. So the question then becomes, are they wrong in excluding him for the safety of him and the university? I believe they are wrong because Dr. Kinshy had no good answer to the question of why is Gavin not the safest person on the field with respect to heat stroke, which was the only concern outlined for his exclusion from the team. That is what I feel. Now I'm out of time, I would- You are out of time, and I did hold your colleague to her time. Yes, if I may say something very quickly. I, again, apologize for getting excited there a moment ago. We all do this in the courtroom. You don't need an apology. You've done a fine job. What I would also say with a court that has expressed its opinions, I will say that if any member of this panel were to rule in our favor and be the only one, a dissent in our favor would mean a lot to the family. So, I'm sorry to be so realistic. I haven't heard that before yet. All right, all right. Thank you very much, Your Honor. It is interesting to me, that last question I asked, and I'm just asking it. It seems to me that you could proceed on this case and simply go with the act and not try to rely upon saying, well, give this position deference and you could simply deal with the reasonable accommodations and whether there's a basis upon which a university can work with the ADA. Is there another setting outside of the university, and you put this in correctly, that Halpern and Davis are not sports situation, academic situation. They got a position there, and they got a position here. And the questions from us and what seems to be coming from you is, deference goes to that position. Is there another setting? And I'm thinking of all of the dangerous occupations. Football is dangerous, but it's a terrible sport. It's terrible in terms of getting injured, but you could be in a chemical plant. You could be a whole lot of places out there where it could be really dangerous if you can't walk, for instance, properly, or if you can't see, or if you can't hear the bells or the alarms. And yet, there are tons of cases in ADA that they found that reasonable accommodations could be made, and are you representing that if a company doctor came up and said, no, that would be the end of it? No, Your Honor, I'm not. Differentiate that for me. Why university, not just in sports now, but university, period, has a position that can give university this privilege against the ADA, but no one else can? All these major companies, and that's around the world, and all these other things that's going on, but university gets it. Or is that not the case? Does anybody else get it, other than university? Well, the employers have been given some deference in situations where there's a life-threatening injury. I just want to know, is there anybody else that gets what the university gets with regard to a position that's hired by that entity for the purpose of protecting that entity? Well, that's not- Is there anybody else that gets that? Well- And the answer could be simply, no, and I'll just live with it. That is kind of why I'm going to keep asking you so I know the answer, though. That's not the answer, Your Honor. The answer is not no. The answer is somewhat qualified. If you look at the Chiari versus City of League Cities, for example, that was an employment situation where the doctors that the employer hired determined that it was not safe, that there was no accommodation that could make the employee safe, and the court did defer to that judgment. Now, it wasn't the kind of deferential standard of review that we have here, but I- But our answer here is not that we can't make accommodations to make him safe. It's that his condition in and of itself renders this something that you can't do, and as Judge Niemeyer has alluded to it as a football player, it makes the operations disruptive. That's a totally different thing than we cannot accommodate. Well, yeah, there's really two issues, Your Honor. First, is he qualified at all? Can he be made safe? And then, does the requested accommodation make him safe? But I'd like to point out that this is so far different from an employment situation because of the reason that this policy was adopted. All the pressures that there are on universities- We have airline pilots. What is the policy? What is the policy that's been- That you need- I like the airline pilot one, too. That's a good one, too. That you need an independent- I hope the physician there can come up and say that. I'm not sure. That you need an independent medical judgment, because there's so much on coaches and on players, from parents, from the administration, from everyone, to get these players back on the field and to risk their health and safety. But that position gets that deference in an academic setting on the Davis and Halpern, too. So I'm just trying to understand, what is this position at the university? Why does it get this special status? Why not just analyze it under ADA, and if you want to reach that, do it But then, you know, the court error, the clear error is this, because he should have done this instead of that, or because of position there. Because after much study, the consensus was that this kind of policy is necessary to protect the student-athletes. Well, with regard to the deference, are you saying that the same order of deference is accorded to the decision whether he's otherwise qualified as- it's the same level of deference with regard to the reasonableness of the accommodation? Yes. Are you drawing any distinctions? No, Your Honor. I'm trying to think of how you would be writing this opinion. No, Your Honor. You would say it applies equally? Where life is at stake? The same level of deference? Yes, Your Honor, where you're talking about safety, because they both involve the same issue. Can he play safely without risk to his life? Can the team physician certify that he can play safely? And I'd like to speak to another thing Your Honor commented on, and that is the scope of this injunction, which interferes with the team doctor going forward. The injunction actually prohibits any consideration or preventing him from playing over concerns about his status as a heat stroke victim or, you know, recipient of a liver transplant. That's a J689 and 691. And so how this team doctor going forward is supposed to keep him safe during a football game when she can't consider very important parts of his medical history under the district court's injunction? Is this, you know, a separate independent problem with this injunction? You know, in this case, there's really a severe impediment now, you know, if he were to play again on the team doctor's ability to keep him safe. And then the other comment I'd like to make is, again, to point out that she did much more than reach a gut reaction that she couldn't say it was safe. She gave him a physical examination. The results of that examination are in the record at JA 102. She reviewed his medical history. She looked around, consulted other colleagues. You know, she determined that no one like him had ever safely returned to play football. And under all these circumstances, she very reasonably concluded that she could not certify, you know, in the exercise of independent medical judgment that he could safely return to play football. Thank you, Your Honor. All right. Thank you. We will take this under advisement, and we recognize the expedition that the parties have wanted us to rule on this case. We'll come down and greet counsel after adjourning for the day. This honorable question is adjourned until tomorrow morning. God save the United States and this honorable court. Thank you.
judges: Paul V. Niemeyer, Barbara Milano Keenan, James A. Wynn, Jr.